Thank you, Your Honor. Good morning. My name is Michael Fish. With me at counsel table is Mark Budwig on behalf of the appellants. I'd like to reserve a few minutes for rebuttal, if I may. I'd like to discuss two issues with the Court this morning. The first is whether terminating a contractor for default is even available in a case like this, where since the date that the public entity has declared the termination, it has continuously used the work of improvement without making any repairs, and it was up to a year, almost a year, at the time of the hearing. The second issue I'd like to address is focusing on the district court's written order in November of 04 and demonstrate that it is based on findings that are clearly erroneous. Looking at the first point, all the cases agree that terminating a contractor for default is the most drastic remedy available and can be imposed only when there's a material breach that goes to the very essence of the contract that defeats the purpose of the contract. It's just one of many remedies for a breach, but the breach has to be drastic. As Mike Traylor stated in his affidavit in this case, short of debarment, a termination for default is the most negative piece of history that can be imposed on a contractor. Now, in this case, we know that the hearing was in June of 03, and the alleged termination or the claimed termination was in July. I'm sorry, June of 04, and the termination was in July of 03, almost 11 months. Let me ask you a question, because I was somewhat puzzled by this statement that it's like a death sentence when you have to answer the question, we've been terminated. The fact is somebody's tried to terminate, and the fact is that you're contesting that and you're litigating it. Is it as damaging to say that there's a dispute and it's being litigated as to whether they have a right to terminate us? Yeah. The evidence in this case, there's two declarations, one of Mike Traylor and the other of George Williamson, that state that termination is a self-help remedy that the public entity engaged in in this case. And as a result, Traylor Brothers is required to disclose in its bidding applications even now that this has occurred and that in most cases it's an automatic disqualification. Well, let's see. You guys said you would drill them a tunnel that would move water from point A to point B. If I understand your argument, as long as we put in something or other that will move water from A to B, tough luck. It doesn't matter if we give them what they asked for. It doesn't matter if we give them what they want. It doesn't matter if the thing will plug up with ice. It doesn't matter if it fills up with silt. It doesn't matter if we put a big belly in the middle of it. None of those things matter. The water moves from A to B, and that's the end of it. And so, therefore, they can't terminate us. That's not – Well, that sounds like what you're saying. No, that's not the evidence at all. The evidence is we built the tunnel. It was misaligned. We put in a pumping system to remedy that. I understand that. Was that the original – the original contract said, it doesn't matter if you put a big dip in the middle of our tunnel, as long as you put in a pump that you think remedies the problem. Is that what the contract said? No, the contract doesn't say that. No, the contract, if I understand it, with the specs that you presented to them, said, we're going to have a nice gravity flow tunnel that goes from point A to point B. Now, never mind the fact that when you got to point B, instead of it lining up right, it had to have a special structure in which the water would pour and then rise up and then go off to the other part. Never mind that, because I think maybe they agreed we could live with that. But what about this big dip in the center? Is that what they agreed to? And, therefore, it's a garden variety breach of contract case. If there are damages flowing from the misalignment, there are – Well, you can call it that, but suppose I contract to have you build me a mansion. You build me a chicken house. And I say, well, I wanted a mansion. I said I would pay $10 million for a mansion. You put in a chicken house. And you said, hey, no big. You can put a bed and sleep in the chicken house. It's just a breach of contract. But I might say, whoa, wait a minute. You violated your contract, guy. And I'm terminating you to have somebody build me a mansion as opposed to a chicken house. What about that? The difference, Your Honor, is in this case all the evidence is the tunnel flows the quantity of water at the specified rate called for by the contract. There is no impairment to the flow of water through the system. Well, you could say I put a sink and a toilet and I put a stove and I put a bed. What else do you want from a stinking house? It's good enough. It does the job that you want. You wanted a roof over your head and you wanted a bed and you wanted a bathroom, right? Well, you got one. You wanted a kitchen, yeah. You wanted a living room, yeah, and a bedroom. You got it, baby. Your Honor, a room – I mean, it seems that your argument is that as long as the thing moves water from A to B, it doesn't matter how it moves it. So you could have put in 10,000 munchkins instead with cups. Remember, this was a contract for the strictly utilitarian purpose of delivering water from point A to point B. It wasn't for human habitation. It didn't have to look pretty. It simply had to function. This was a design-build contract. Traylor Brothers, the design requirements in this contract are very minimal. It's basically move a certain quantity of water over a certain distance over a certain period of time. And the undisputed evidence is it does. It does. They had something that moved water from that A to B previously, right? And they weren't terribly satisfied with what they had, and that's why this contract went out. Am I wrong? That's correct. So they already had something to move water from A to B, and you said, hey, but you're telling me, hey, but as long as what we did moved water from A to B, that's good enough, right? Well, Your Honor, it's good enough because it complies with all the contract specifications, which are simply to move water from A to B. Even if it's going to plug up every winter. Let's say you – let's say that's what you did, and the evidence is that every winter the thing will plug up. And you say, hey, but wait a minute, it moves it from A to B. Well, first of all, you know that the record – that there is no evidence that it plugs up every winter. I'm trying to – I'm trying to test the limit of your argument. Or they say we want it to move from A to B, and we don't want to have to go in there and clean out a zillion tons of silt every year to keep things flowing right. And you say, hey, look, never mind silt, it moves it from A to B. Is that okay? Here's – Your Honor, if there's a cost associated with remedying a blockage that occurs every winter, they're more than entitled to put on their evidence in a breach of contract case and recover damages to fully compensate them for that loss. It's a garden variety breach of contract. The remedy of termination is a separate remedy that makes no sense when the job is done. That's the distinction. We're not – we have never said that El Dorado is not entitled to be compensated for any damages it can prove resulted from a breach of contract. That's an entirely different issue. The issue in this case is can they additionally invoke the drastic remedy of terminating a contract after it's already over. And that's a very important distinction. Is the contract in the excerpt of record? Yes, the contract is in the excerpts of record. Most of it is in volume two. Volume two? Yes, sir. You don't happen to know where, do you? Well, I can – there's – No, if you don't know offhand. I do know if I mean offhand. It's around page 355, for example, is the section on payments. It's several hundred – it's about 100 pages long. Termination clause. Termination clause I can get you to. 404. All right. Thank you. No, Judge Fernandez gave it to me. Termination is on 404 to 405. How do you pronounce the kind of ice that forms? Is it frazzle or frazzle? I've heard it frazzle. Frazzle ice. Yes, sir. And that's going to happen every year? There's no evidence that it's going to happen every year. In fact, they just went through the second winter, and there's no evidence in this record, and I'm not aware of any, from their brief. They don't say that there was ice this year. The year that there was ice, the evidence is it was unusually cold. And the most they're able to say in their brief and in the evidence put forth in the district court is there's a concern about what may happen in the future. That's the extent of the evidence in this case as to damage. And as I said ---- I thought they said that if they hadn't just happened to dewater it on January 6th or 7th, whatever it was, it looks to them as if the thing would have plugged up. The them is Mr. Rogers, who then was deposed and said, quote, he had done no analysis to see how likely it was that the tunnel would get blocked by ice. That's on page 301 of the excerpt. Right. It's very ---- He said it had gone so far already that it looked to me, and he's not exactly nothing, it looked as if it would plug up. Well, there's also conflicting evidence from two other witnesses that it was a slurpee. Remember, it had the consistency of a slurpee. That's Martin and Mueller excerpts of the record, page 186. So there's a conflict, Your Honor, in what the facts are. Remembering that in this proceeding, on a motion for preliminary injunction, is not the time to determine if it was a blockage or a slurpee, but simply whether Traylor Brothers has a fair chance of establishing that it was not a blockage. Also, when you say that Mr. Rogers is no small, you know, has no small stature in this case, while that's true, he was also employed by the engineer in this case, who, to say the least, has a certain bias, since it was the engineer who was responsible under the contract for approving the payment applications. Following termination, what did the owner do to complete the project? The termination occurred on July 16th, and the owner was, I'm sorry, what the owner did? The contractor? Yeah. No, no, no. The Eldorado Irrigation District. The evidence is they performed no work on this tunnel other than punch list items. That comes from Rogers. Other than what? What they call punch list. A punch list are minor, usually considered minor repairs. In his declaration, I'm sorry, in his deposition, Rogers testified that since July of 03 when they declared the termination, no work had been done on the tunnel other than these punch list items, and yet they had continuously used it for its full purpose the entire time. Is your position that you cannot terminate after it's been completed? That's correct. Do you have authority for that? Yes, plenty. There's two cases cited in our brief, and there's also a well-regarded treatise, Bruner and O'Connor, on construction law. It's Section 18-12. It's the entire 18-12 of that treatise. That whole chapter is on what you just asked, and there they say, once there's substantial performance, there cannot be termination. They're mutually exclusive. Remember that the whole purpose of terminating a contract is to secure future performance. If there's no future performance left to do, then the only appropriate remedy is the ordinary remedy for breach of contract damages, not termination. That's the point. If there's no other questions on that, I'd like to move to my second point. It's very important on the first point to appreciate the deposition testimony and the cross-examination of Mr. Rogers that the district court did not consider in its ruling. The district court made a critical finding on page 14 of its written order where it says that Traylor Brothers does not dispute that it refused to perform any testing of the tunnel. That's in the supplemental excerpts, and it's the district court's November order. That's a key finding because from that, the district court concludes that the termination is appropriate. That finding is clearly erroneous because it ignores the two declarations of Mr. Cangellosi. One, it occurs in the excerpts around page 172, and then in the reply papers an additional affidavit was submitted at page 311. And Mr. Cangellosi goes through in some detail exactly what that July testing consisted of, and it consisted of first removing water from the diversion structure. That's important because if there's water in the diversion structure, that means there's water in the complete tunnel, and that water was removed over the course of a day at the rate of 1,000 gallons a minute. That's quite a substantial amount of water. And then beginning on July 11th, Mr. Cangellosi explains in his declaration that another pump started to dewater the dip or the center of the tunnel, and that that continued to run. And this is important. He says this procedure tested the Godwin pump with the most water it would ever have to handle. That's at page 312. And that's the test that Traylor Brothers performed in July. That's the test that we contend shows that the dewatering system works. And that's the test that Mr. Cangellosi says in his affidavit at page 313 of the excerpts, that MWH, the engineer, concurred. And that critical test is completely ignored by the district court in its order. And when you're looking at the district court's statement of the facts of this case, and especially the chronology that appears on page 6 of the district court's order, the district court goes from July 2nd and then jumps to July 3rd and then to July 15th, completely omitting the July 7th, 8th, 11th, and 13th tests that Traylor Brothers ran on this tunnel that dewatered it. And it's from that finding that then the court says in its order that a substantial amount of sediment accumulated in the dip. And yet in his deposition, Rogers admitted he had no engineering evidence that sediment would reduce the flow and there was no evidence that sediment buildup is likely to cause blockage. That's at page 305 of the excerpts. Let me ask you a question, and it's probably irrelevant to this case, but it's just something one wonders. If the situation is so desperate when termination is threatened or is actually done, what precisely was it that, besides we don't got to do it, that kept Traylor from saying, OK, guys, let's do a full water-up test of this thing. We'll pay for it. You guys might have to pay for it eventually, but we'll pay for it now. Since we realize we gave you something different from what you asked for, we'll do the full water-up test you want and show you that it works. Maybe there's nothing in the record that tells me the answer, and so that's the answer to me. Tough luck. It's not in the record, so we don't know. But I'm just kind of curious. Well, I can answer it with what's in the record, and I won't go with what's outside the record. Let me talk about what's in the record, which is the contractual provisions regarding who has to pay for what tests, and that's in Section 602 and 1303 of the contract. And what these provisions provide is – But, look, let's not look at the contract provision exactly because, as the district court said, by the time we get there, you've already breached the contract. Actually, it was under 602 and 1303B that Traylor Brothers paid for the first test. We're not saying they don't have to pay for a test. Traylor Brothers' position is we did the equivalent of a full water test, and we paid for the first one, and it showed it worked. We'll perform any other test you want if you pay for it, El Dorado. And El Dorado says, no, we're not going to pay for it because the contract says you have to pay. So there's a dispute. Do they, El Dorado, owe Traylor money at this time? $3.5 million. All right. So what – I don't understand practically this problem. If they paid for the test, they would withhold it from what they owed you anyway, right? The practical – now, this is outside the record. I don't – I mean, the reality is the way this job had gone, Traylor Brothers had already built the tunnel. They've already proved it worked. It's water from point A to B. And it just would have been something else. If after this test was done, it would have been something else. They hadn't been paid. Did they owe you money? Did they – is that money that they claim they don't have to pay you now at all? They held the money at the time. They held it for 10 months. And I believe their claim is they don't have to pay it at all, but I don't know. It's not in the record. But what is in the record is at the time they terminated Traylor Brothers, they hadn't paid Traylor Brothers for 10 months, and they were withholding 3.5 million of earned contract funds. Is there any – that's what I'm trying to find. Is there any dispute about that 3.5 million being due? I don't think so. So they could have deducted the cost from that money? Right. And the contract gives the owner the right to deduct the cost of doing remedial  That's one of the remedies they have under the contract. Other than the test, the – there was one other thing that they said that you had to do before substantial compliance. See, I just lost that page. They give you a notice that you cannot give us a notice of substantial compliance unless you do several things. Two out of the three had to do with the test, and the third had to do with what was constructing of a dewatering. Do you recall what the third was that they asked? I don't. If it was constructing the dewatering equipment, that was done. And the diversion structure was done. And the testing was done, as described by Mr. Tangelosi. The project was done. And the proof really is in the pudding, isn't it? If they've been running water through it for now two years, and the most they can trailer brothers left in July of 03, it wasn't done. They've done no remedial work, and they've been using it. What if trailer brothers have been contracted to build a road, and for the last two years there's cars been driving on the road? And the owner says, well, we're not going to pay you for the road because you're not done. Did you install the inline pump to the tunnel dewatering system? Yes. Is that done? Yes, Your Honor. That's the Godwin pump. That's Tangelosi at page 312 of the excerpts. The pumps were in. And Tangelosi says they worked as designed. The brief says, I guess it's an excerpt of record 259 to 260, that there were three things, although they say they're not exhaustive, that had to be done before you could give a notice of substantial compliance. One was install the inline pump. That was done, you say. Two, complete a full dewatering test. That, we understand, is a dispute over. And three, have URS, their engineering consultant, on site to witness and verify installation and procedures prior to and during the test. So two of the three involved the test, and one you say you did. The Godwin – that's for the Godwin pump. Yes, we did it. And that's at excerpts page 312. So is that what the dispute was about whether there was substantial compliance, the only or fairly to do the test? The dispute – yes, the dispute was over the test that Eldorado claimed we didn't test the dewatering. Your view of the dispute is that the only thing that prevented substantial compliance in their – according to their position was that you didn't do the test. The only ground for termination that they asserted – No, no, I'm saying what – about the only reason that they contended you were not in substantial compliance was the ability to perform the test? That would be my position, because that's what their termination letter said. The July 16th termination letter says that that's the ground, that we didn't perform an adequate test. We say we did. The thing is done. It's been running for two years. How could it not be complete? Well, yeah, okay. You've got a road from A to B, and there's cars driving on it every day. Now, if the road is a little out of alignment – Do you want to save three minutes for rebuttal? Yeah. Pardon me? Was that a polite way of saying I'm done? No, no. I guess we're – you're over three, so we'll give you two. Okay. Thank you. May it please the Court. My name is Mark Stump. I'm attorney for appellant – for appellee Eldorado Irrigation District. With me in the courtroom today is my co-counsel, Thomas Cumston, general counsel of the Eldorado Irrigation District. In light of the argument that I've heard thus far, I think that my comments are going to be briefer than I had originally planned, but let me make a couple of points. First of all, this is a case about contractual interpretation. When we talk about what is a valid termination of the contract, you don't really start – the starting point is not that you look at case law. The starting point is that you look at the contract. And so that's where I would start with this analysis. In our contract, Eldorado has the right to terminate trailer for cause under the contract at paragraph 15.2. That's at the record – it's in the record at page 208. If trailer fails to supply skilled labor to the project or, quote, violates in any substantial way any provisions of the contract documents, close quote, I don't see how there can be any doubt at all. I don't see how there can be any possibility. Do you agree that if the – if they had built the tunnel, even though there were breaches in it, that once their work was over, that you couldn't terminate? You could only sue for breach? I would agree that once the contract performance is entirely over, that is correct, although I would also argue that that's not the situation we have here. Okay. Now, what completed this – what prevented this from being in substantial compliance, as I understand your notice to them, was that they didn't do the test you wanted. Well, certainly we needed to have the test in order to have the information to know whether the dewatering system was going to work or not. And we also had a lot of uncertainty that we were facing about whether the tunnel in general was going to work under all conditions that the tunnel is exposed to. So they might have completed the work and it might not have worked, in which case you would have had a breach, right? Well, we analyzed the issue somewhat differently. We have under the contract the right to accept their defective performance or to require them to fix it. And we had elected to require them to fix it. And so what Traylor Brothers was doing for the last six months they were on the job was attempting to fix it at their own risk. And when we say attempted to fix it, there were a number of things that were done. At the lower end of the tunnel, this diversion structure was constructed. The pump was installed in the middle of the tunnel. Five thousand feet of pipeline was installed to take the water from the bottom of the dip out to the end of the tunnel. So they did some work to attempt to fix the problem caused by the dip in the tunnel. But we said they weren't done. If I understand it, in regards to the way one could technically read the notice, what you're really saying is the breach or the failure to do their job is not the failure to test. The breach is this thing they gave us that isn't the tunnel we wanted. And now the question is have they fixed it. And they say we fixed it. And you're saying prove it. Well, that's right. And if they can't prove it, well, then they can't prove it's fixed. Then it's still in breach. And it's not the job's not over. Is that your position? Yeah, that is our analysis. That's right. Every time there's a breach doesn't mean the job's not substantially completed. It means it's completed, but they've completed it in a way that's a breach. Well, that's a good point, because the contract deals with how we're going to define what substantial completion is. That language appears at 1406 of the contract. And that is at page 402 of the record. And what goes on when a normal contract ends is that a the parties come to an agreement that a contract is substantially completed, which means that in the words of this contract, that the entire work is ready for its intended use. And at that point, the contractor's remaining obligation is, as Mr. Fish was saying earlier, to complete punch list items. They're not done with the work, but they're far enough along with the work that the owner can use the project. And so we think that the entire work includes something more than just moving water from point A to point B. It includes the ability to be able to use the tunnel in difficult winter conditions without worrying about an ice blockage. It includes being able to use the tunnel in circumstances where we have to stop the flow of the water through the tunnel for some reasons to be confident that we can get water out of the middle of it in a reasonable time. So we don't think there was ever substantial completion and under the terms of the contract, and that's really what we need to look at, not so much the cases that they cite from that talk about contracts that have dissimilar language to ours. It's difficult to know, I think, abstractly or maybe concretely, what the difference is between something being substantially complete but not being what you want and therefore there being a breach of contract, and something being so unacceptable like the chicken house Judge Fernandez talked about, that you'd say it's not substantially complete. Now, if the object functions and you use it basically as it is and it functions, that would seem more likely to be something that was substantially complete, but there was a breach and you're entitled to damages. Whereas if it's something you said, who needs this tunnel, I can't get water through it, we're going to abandon it, you may have completed the tunnel, sell it to somebody else, but we're terminating you. Where you draw the line between an imperfect product that you received and used and therefore you have a breach, and one that is not, it's just a chicken house and it doesn't serve your purpose, and you terminate. Well, I think that the only answer to that question can be in the particular facts of a case. And therefore, we have to look at the particular facts of this case. Are the facts here that you do use this tunnel, it does what you wanted it to do, and you haven't done anything further to it? Well, that's exactly the question that Judge Carlton asked me when we had a hearing on this last June. And at that time, I couldn't answer the question as to what the district's plans were to remediate the problems of this tunnel because they hadn't developed those plans yet. It is, I would have to go outside the record and tell you subsequent developments to be able to answer that question. I won't do that. But the fact is, is that the district has extensively studied what needs to be done with this tunnel now and is ready to make a selection as to what needs to be done to make this tunnel what we bought. The question is, is that the kind of thing that's remedied by damages for breach of contract? Plainly, it's going to cost money to fix the tunnel. And plainly, it's not just trailer doesn't have some kind of exclusive expertise that it and only it can fix the tunnel. So the answer to the question is, is the ability to collect damages relevant to the issue of defining substantial completion? And under the definition in the contract, I don't think it is because it talks about the work being ready for its intended use, not whether deficiencies in the work as it's constructed could be remedied through another contractor paying them the money to do it. Well, even if you terminated them on the third day, when it wasn't substantially complete, I assume it would only be money it would take to fix it, right? That's the damage question, right? I mean, you're trying to tell us the difference, but it looks to me like whether you call it termination or breach, everything, most things in the physical world are curable with money. So it's always a damage question at the end of the day, is it not? It would be preferable as this contract is set up and as the substantial completion clause is set up, the assumption is made that the contractor is already going to be on the job, mobilized and ready to do something to fix the problems. And so at that point in the game, it's preferable to have the contractor there doing it because they're already there. May I ask you, what difference, does it make a difference to you whether it's termination or breach? If you were to say, okay, substantially complete, but it's worth 10 percent of what we bargained for. Your breach is 90 percent. We're going to bring in somebody else and have this, all these changes made. You're in breach. We're withholding the payments. Are you in any different position than if you terminate it and do the same thing? In terms of the position that we're in in this lawsuit, yes. No, no, not in this lawsuit. Okay. Go back to the day you terminate it. From your standpoint, did it matter whether it was a breach or a termination? I haven't thought about that question. Well, clearly if the trailer is still on the job site, it matters. No, no. They say substantially complete. You say, fine, go away. We'll take it with an understanding that it's in breach and we're going to hold back your money and sue you for any more damages. Is that different from your standpoint than if you terminate it? Under the terms of this contract, I think it probably is. There is a limitation in this contract, and I don't have the section to give you, unfortunately. Well, you don't have to go to the arbitration board if it's terminated. Well, that's one of the benefits of having a termination. It makes a difference. It is a difference. And that was the point I was about to make. So that's one difference right there. Now, you would have had to go to the board if they had referred this dispute to the board before the termination. That's true. And the board's supposed to, if it's an important matter, they're supposed to act promptly. They're not supposed to wait for the next meeting, right? They are supposed to act promptly on it. That's part of the process. How long had it been since they referred it to the board? There was a reference of 14 issues to the board, I believe, through a letter of August 20. I might be wrong. Of 93. At least six months later, and there had never been a board meeting? Well, and the reason for that is that the termination, what we have is from August of 03 to January of 04, I don't think we have anything in the record that shows why there wasn't a board meeting. After that, there was a termination, and we took the position as the district that the contract had been terminated, therefore, there was no. But there were months in between where nothing was done, whereas if somebody from the board had said, okay, we're having a meeting, let's open the session, then they would have had to go through with it. Because if it's in progress, you agree the termination doesn't stop it. I don't believe there's anything in the record that describes what happened, and I was not personally involved in that, so I can't even tell you off the record. In between, though, weren't there a lot of notices and letters going out saying we're going to terminate you and we'll set the termination date for date A, and then it became date B, and the date kept slipping? But during that interim, it seems to me, there were a lot of notices, we're going to terminate you. What was happening was that the tunnel was not available for them to do the test because we were using it to flow water. Therefore, there was no basis for saying that they should be terminated because they didn't do the test because the tunnel wasn't available for them to do the test. So we gave them these extensions. That was the purpose. There was a July 17th letter about termination, and there are letters throughout this period. I don't know if that explains why the Board was delaying, but the record does show that. It's outside the record, to the best of my knowledge. So I don't have an explanation to give you. Anyway. The basic reason you say it's not substantially completed is that the test might have showed that there was a lot more work necessary? The test might have showed that the entire dewatering system had to be replaced because it wasn't going to perform the function that the tunnel, as originally designed and constructive, would have performed, which was to allow the water to be cut off at the top of the tunnel and flow out through the tunnel within a few hours. We never got to a place where the dewatering system could duplicate the intended performance of the tunnel as designed. So the question for the district was going to be, do we just accept this or not? But without knowing how long it's going to take for the test to, if I may start over, without knowing how long the test is going to show it's going to take for the water to be pumped out, you lack the information to know what to do. And you didn't know at the time that you would, despite the fact that you were withholding payments, you didn't know at the time that you would ever have to pay anything more? Because had it proven to be really defective, you then wouldn't have had any further obligation? I don't have an answer to that question, Your Honor. I just don't know. Because otherwise I had the reverse question of Judge Fernandez's, which is why not go ahead with the test, find out what you want, if you were withholding money from them anyway? Everybody seems to have gotten their backs up about who's going to pay, and if you were really holding their money, you could have just done it and taken it out of the money you were withholding. Mm-hmm. I don't know what the thinking was on that. Another point that I was intending to discuss with you is the issue of what I think of as Traylor's third line of defense here, which is that even if the termination clause is found to be potentially enforceable because they did not substantially complete the contract and because the termination clause itself says that any substantial breach is grounds for terminating, the question is what quantum of evidence does it take to raise a serious question as to whether Traylor has an opportunity to prevail in this issue at trial? The trial court was very clear on that. They did not believe that he did not believe that there was a serious question presented and gave the reasons why. We've heard some argument today from the other side saying you can't trust Dave Rogers, but the district court found otherwise. That's the district court's call to make. It's an evidentiary determination based on the credibility that the district court assigned to the witnesses' declarations. May I ask you one other question? Is this case scheduled for trial at any point? It is not, and the reason why it isn't is because, frankly, we've been waiting for this hearing to occur. The idea was that if there is a reversal here, I suppose, that you would have the DRD hearings and the DRB hearings are intended to produce these reports that would then be introduced to evidence at trial. So you don't know how to shape the trial until you know how the appeal is coming out. Nonetheless, we are going to be having a case management conference pretty soon. Also, the district has been ordered to produce preliminary expert reports to establish what it is we need to do to fix the tunnel. And that, those reports will be produced, I believe, on June 11. Thank you, counsel. Did you have something else, Your Honor? I think I'm going to stop while I'm ahead, and thank you very much. Just a couple quick points. Your Honor, the termination remedy, you're right, it gives El Dorado nothing, no remedy, no benefit they don't already have. Other than avoiding the board. Other than avoiding the DRB, and the punitive one that the district judge recognized, that because of the terrible effect this has on Traylor Brothers' ability to do business in the future, with this looming over their head, it just squashes them and puts them in a terrible bind with regard to this litigation. In terms of, quote, fixing the tunnel, if it needs to be fixed, ordinary breach of contract remedies give El Dorado everything it needs. With regard to the DRB, they agree to the DRB. The DRB is a wonderful thing. We put in our brief a citation to a DRB manual. The DRB settles like 99% of the cases that go through the DRB settle. It's a wonderful thing. It resolved three disputes already in this case. It's nanned by engineering and tunnel specialists and experts to get to the bottom of disputes. It's really a shame that this thing hasn't gone to the DRB, and maybe none of us would be here. Kennedy. I agree with that. It would be better for the courts to go to the DRB. But, you know, I don't know what's in the record or what went on. All you had to do to get it to the DRB is get them to hold, just get together and say the meeting's open, and then under the agreement, once it was open, they have to complete it. What is in the record is a letter from Eldorado to the DRB saying, in light of their self-declared termination of the contract, the DRB is disbanded. That is in the record. That's after several months. That is after several months. You had submitted this dispute many months before that, and all it would have taken. That's not in the record, Your Honor. In terms of substantial completion. And you're not contesting the fact that for purposes of the contract provision, the the the it does terminate if the meeting, dispute meeting, hasn't actually opened? That issue wasn't argued. Okay. Because it is a rather odd clause, which says if there's no meeting, and as to the case, it seems to have been started. So unclear what happens if the hearing's ended and you haven't started writing the opinion. Yeah. I agree. You don't have to worry about that clause. Well, what we do have to worry about, though, is the undisputed evidence from Mr. Cangellosi that the test was performed in July, that it was adequate, that their engineer agreed it was adequate. And that, which is probably the most important fact in this case, is curiously from the district court's order. And that's where the district court makes the U-turn and goes the wrong way. And that's why the court's order is flawed. Because the court here's what happened. It's really interesting. If you go through and track the district court's order, its statement of facts, and put right next to it Mr. Rogers' declaration, his first one with the TRO, it tracks almost verbatim. What happened was the district court in the five months between the hearing and its written order apparently overlooked Mr. Rogers' deposition testimony, which totally undercut what's in that declaration, and also the conflicting evidence that Traylor Brothers put on. And let's remember the context of this proceeding. This is not a trial. This is a motion for preliminary injunction. We don't have to prove our case. We just have to prove there's a fair chance we could prove our case.   It's completely under what Mr. Rogers' deposition, evidence that's completely ignored by the district court in its order. The district court's order is an abuse of discretion. It ignored most of the evidence in the case. It reached an incorrect result. The contract remedy is totally adequate to compensate them. There's no reason to punish Traylor Brothers with a termination on a contract that's done and that they've been using for two years. Thank you. Case just argued will be submitted. The court will stand in recess for the day.
judges: Reinhardt, Noonan, Fernandez